Caroline **PIESZAK, M.D.,** Plaintiff,

v.

**GLENDALE ADVENTIST MEDICAL CENTER, et al., Defendant.**

**No. CV 97–4705 ABC (CWX).**

United States District Court,
C.D. California.

Aug. 1, 2000.

Andrews & Hensleigh, Barbara Hensleigh, John Aumer, Los Angeles, CA, for Plaintiff.

Rushfedlt, Shelley & Drake, Linda C. Miller Savitt, Gordon N. Kojima, Sherman Oaks, Demetriou, Del Guercio, Springer & Moyer, Jeffrey Springer, Regina Cobb, Los Angeles, CA, for Defendant.

ORDER (1) GRANTING DEFENDANT LOPEZ' MOTION FOR SUMMARY JUDGMENT; (2) GRANTING IN PART AND DENYING IN PART DEFENDANT RIFFEL'S MOTION FOR SUMMARY JUDGMENT; AND (3) GRANTING IN PART AND DENYING IN PART DEFENDANT GLENDALE ADVENTIST'S MOTION FOR SUMMARY JUDGMENT ⹁

COLLINS, District Judge.

Defendants filed three separate motions pursuant to Fed.R.Civ.P. 56 on January 31, 2000. Defendants' motions came on regularly for hearing before this Court on July 17, 2000. After considering the materials submitted by the parties, argument of counsel, and the case file, the Court GRANTS AND DENIES the motions as indicated herein.

## I. Procedural Background

On June 26, 1997, Plaintiff Caroline Pieszak, M.D., filed a Complaint against Defendants Glendale Adventist Medical Center ("GAMC"), Hugo Riffel, M.D., and Robert Lopez, M.D. The Complaint alleged various claims stemming from Pieszak's participation in GAMC's Obstetrics/Gynecology residency program. A First Amended Complaint was filed on March 24, 1998. On October 15, 1998, the Court granted Pieszak leave to file a Second Amended Complaint ("SAC") and a Supplemental Complaint ("SupC"). Pieszak filed the SAC on December 17, 1998.

The SAC alleges twelve claims for relief. Eight claims seek relief from GAMC only. These claims are three Title VII, 42 U.S.C. § 2000e, claims (gender discrimination, sexual harassment, and retaliation), a breach of contract claim, a bad faith claim, a state Fair Employment and Housing Act ("FEHA") claim for gender discrimination, a negligent supervision claim, and a wrongful termination claim. The SAC alleges one claim against GAMC and Riffel: A denial of fair procedure claim. Two claims seek relief against all three Defendants: a FEHA sexual harassment claim and a FEHA retaliation claim. The final claim is a slander claim against Riffel only. The Defendants answered the SAC.

The SupC alleges two retaliation claims against GAMC. One of the claims is based on Title VII; the other is based on FEHA. GAMC answered the SupC.

Before the SAC was filed, Defendants filed various motions for summary judgment. On October 15, 1998 and again on December 16, 1998, the Court took those motions under submission pending the California Supreme Court's ruling in *Kelly v. Methodist Hospital of Southern California.*

On November 23, 1999, the California Supreme Court still had not heard oral argument on *Kelly.* On that date, the Court informed the parties of its intent to proceed with the case. After receiving a status report from the parties, the Court ordered the parties to refile their motions for summary judgment and issued a briefing and hearing schedule. Before the hearing, however, the California Supreme Court heard oral arguments in *Kelly.* On March 10, 2000, the Court once again continued the hearing to July 10, 2000 to await the *Kelly* decision. The *Kelly* decision was issued on May 11. *See Kelly v. Methodist Hosp. of S. Cal.,* 22 Cal.4th 1108, 95 Cal.Rptr.2d 514, 997 P.2d 1169 (2000).

## II. Summary Judgment Standard of Review

It is the burden of the party who moves for summary judgment to establish that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978). If the moving party has the burden of proof at trial (the plaintiff on a claim for relief, or the defendant on an affirmative defense), the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984)). This means that, if the moving party has the burden of proof at trial, that party "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [that party's] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986) (emphasis in original).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, ... the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the non-moving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Id.* at 248, 106 S.Ct. 2505. However, the court must view the evidence presented to establish these elements "through the prism of the substantive evidentiary burden." *Id.* at 252, 106 S.Ct. 2505.

### III. Factual Background [1]

#### A. GAMC.

Pieszak joined GAMC's OB/Gyn residency program on June 21, 1995. (Riffel Decl. ¶ 7.) GAMC is a California corporation organized under the California Nonprofit Religious Corporation Law. (Pl.'s Stmnt. of Genuine Issues re: Lopes Motion ("L.Facts") ¶ 6; Patten Decl. Ex. 1.) GAMC initially incorporated as a nonprofit religious corporation in October 1980. (L. Facts ¶ 4; Patten Decl. Ex. 1 at 131–163.)

GAMC maintains an OB/Gyn residency program. Since 1981, Riffel has been the

1. As required for purposes of a summary judgment motion, this section views the evidence in the light most favorable to Pieszak, the non-movant.

The Court also notes that various objections to evidence were filed by both sides. The Court reviewed all the objections to the evidence upon which it has relied. To the extent that the Court has relied on that evidence in this order, the objections are OVERRULED on the merits. Objections to evidence upon which the Court does not rely are OVERRULED as moot, except as indicated herein.

director of the OB/Gyn residency program. (Pl.'s Stmnt. of Genuine Issues re: Riffel Motion ("R.Facts") ¶ 62.) The GAMC's OB/Gyn residency program has as one of its purposes to provide graduate training on OB/Gyn and related specialties. (R. Facts ¶ 1.) The program lasts for four years. (Id.) The residents in the program provide medical services to GAMC's patients. (See Riffel Decl. Ex. D.) Moreover, the residents in the program are compensated by GAMC for these services. (R. Facts ¶ 1.) GAMC also provides insurance, vacation and sick leave, and maternity leave to its residents. Residents are required to devote their entire professional time to GAMC and are expressly precluded from offering their services anywhere else. (Riffel Decl. Ex. D.) In short, a resident is also an employee vis-a-vis GAMC. The residency program consists of only eight residents, two for each year of the program. (R. Facts ¶ 3.)

GAMC participates in a nationwide "matching program" to select its residents. (Riffel Reply Decl. ¶ 2.) Each participating institution submits a ranked list of preferred applicants, and each applicant also submits a ranked list of preferred institutions. (Id.) The "program" then uses an algorithm to match applicants with institutions.

Eighteen individuals were part of the GAMC residency program from July 1992 to June 1998. (Russo Decl. ¶ 6.) Of these eighteen individuals, six (or 33%) were females. At any one time, females comprised no more than 37.5% of the residents in the GAMC program. (Id.) During the same period of time, over 50% of the residents in OB/Gyn programs nationwide were female. (Id. at ¶ 6.)

During Pieszak's residency at GAMC, the hospital did not provide readily available shower facilities for female residents. (Pieszak Decl. ¶ 40.) Female residents had to either shower in the male doctor's shower facilities or in a patient room. The physician scrub clothes were also stored in the male doctor's facility. Thus, female residents were forced either to enter the male facilities to get physician scrub clothes or to wear scrub clothes identifying them as nurses. (Id. at ¶ 40.)

## B. Pieszak's First Year Residency.

Pieszak applied for the GAMC residency program while still in medical school. (Pieszak Depo at 10–15, 17–18, 24.) As part of the application process, Lopez conducted a "one-on-one personal interview" with Pieszak. (Id. at 24.) During this interview, Lopez asked Pieszak about her birth control methods. (Id. at 10–15, 17–18.) He told Pieszak that "it was well known that Dr. Riffel did not like his female residents to get pregnant during residency" and that "[i]t was not appreciated by the team." (Id. at 18:7–10.)

Pieszak first learned that she had been accepted into GAMC's residency program when she received a letter, dated March 15, 1995, from Riffel welcoming her to the program. (R. Facts ¶ 6.) On March 27, 1995, Pieszak signed a one-year contract with GAMC formalizing the terms of her residency with GAMC. (R. Facts ¶ 7.) The contract stated that she was to start her residency on June 19, 1995. (Id.) Unfortunately, she did not arrive at GAMC until June 21, 1995. (Riffel Decl. ¶ 7.) [2]

The other first year resident in the program was also a female, Michelle May. (See Pl.'s Stmnt. of Genuine Issues re: GAMC Motion ("G.Facts") ¶¶ 7 & 8.) All of the other residents in the program were male.

Pieszak spent the first three months of her residency at White Memorial Medical Center on a "medicine rotation." (R. Facts ¶ 11.) At the end of this rotation, Pieszak received favorable reviews from her supervising physicians. (Pieszak Decl.

---

**2.** Pieszak appears to contest this fact. (See R. Facts ¶ 8.) However, her evidence merely states that she "did not arrive late ... on June 21, 1995." (Pieszak Decl. ¶ 3.) This statement does not create a genuine issue as to when she arrived.

Exs. B & C.) She then returned to GAMC in late September 1995. (R. Facts ¶ 11.)

When Pieszak returned to GAMC, Lopez, a third-year resident by that time, was assigned to "train [her] in." (Pieszak Decl. ¶ 5.) Lopez welcomed Pieszak by throwing a chart at her and giving her "ten minutes to review the chart and report it to the senior resident." (*Id.*) Lopez then told Pieszak that even though he was a better surgeon, nurses and patients would like her better because she was female. The rest of the day, Lopez was hostile, demeaning and abusive towards Pieszak. Lopez continued his attacks the following day and told Pieszak that when he was a fourth year, he would make her life miserable. (*Id.*)

Over the next few days, Lopez continued to belittle, demean, and abuse Pieszak, at times in front of patients and nurses. (Pieszak Decl. ¶ 6.) Pieszak complained to a program physician about Lopez' treatment and about a week later, the second year residents officially assumed Lopez' training role. (Pieszak Decl. ¶ 7.) [3] However, this change did not stop Lopez' harassment of Pieszak. At various times during the next year, Lopez harangued Pieszak. He also made some gender and sex related comments.

For instance, at a Christmas party hosted by the residents for the residents and their significant others, Lopez and some of the other residents told crude, graphic jokes about patients and their gynecologic anatomy. (Pieszak Depo. 93–95.) It was also common for these male doctors to make fun of their patients' gynecological problems. (*Id.* at 146.) Furthermore, Lopez told Pieszak that he had made most of the nurses in the program cry. (*Id.* at 133.) He then proceeded to list the "incompetencies" of these nurses. (*Id.*) Lo-

pez also had been disrespectful to female doctors at the hospital. For instance, Lopez once referred to a female physician as a "hysterical" woman. (Marshall Decl. ¶ 3.) Lopez' treatment of female staff earned him a reputation as someone who harassed, yelled at, belittled, and demeaned female staff members. (*See, e.g.,* Agunbiade Decl. ¶ 7.)

On one occasion, Lopez discussed his desire to have sex with his wife as he, Pieszak, and other physicians were preparing for a surgery. (Pieszak Depo. at 137–139.) One of the attending physicians told Lopez to stop and Lopez complied. (*Id.*) At other times, however, Lopez commented to Pieszak that he had not had sex with his wife in a long time. (*Id.* at 141.) At other times, Lopez and some other residents would make sexual comments and gestures about a female drug company representative who occasionally visited GAMC. (*Id.* at 147.)

GAMC's other male residents and physicians also would joke about the three female surgeons and the female nurses and criticize them as inadequate. (*Id.* at 145.) The male residents made jokes about the weight of female staff members, including Pieszak. (*Id.* at 144, 218.)

On October 19, 1995, Pieszak received an initial evaluation from Riffel. (Pieszak Decl. ¶ 8; Hensleigh Decl. Ex. 51.) She received a satisfactory-high satisfactory overall rating and was rated satisfactory or high satisfactory in every category. (Hensleigh Decl. Ex. 51.) During the evaluation, Riffel said "words to the effect that [Piszak] was performing well and to 'keep up the good work.'" (Pieszak Decl. ¶ 8.) Pieszak also received some general, routine counseling on studying and other "educational" goals. (R. Facts ¶ 12.) [4]

---

3. Defendants' hearsay objection to a portion of Pieszak Decl. ¶ 7 is SUSTAINED.

4. The Court notes that Defendants assert that this counseling was unusual. However, the evidence presented supports an inference that this type of "counseling" was routine. The

Court also notes that Riffel declares that Plaintiff received an evaluation in December 1995. (*See* R. Facts ¶ 12.) Defendants, however, present no evidence besides Riffel's statement of this evaluation. In opposition, Plaintiff declares that no December 1995 evaluation ever occurred. (Pieszak Decl. ¶ 8.)

On February 27, 1996, Pieszak signed another one-year contract governing her second year of residency which was to begin July 1, 1996. (R. Facts ¶ 9.)

In April 1996, Pieszak received another evaluation. (R. Facts ¶ 13.) This time, she was evaluated by three individuals: Riffel, Raleigh Unterseher,[5] and Dr. Leffler, a fourth year resident in the program. (Pieszak Decl. ¶ 9.) She received a few low satisfactory marks, mostly satisfactory marks, and a few high satisfactory marks. (Riffel Decl. Exs. F–G.) She was also counseled on study habits and told to complete reading certain textbooks. (Hensleigh Decl. Ex. 55.) The evaluation team also reviewed Pieszak's results from a test referred to as "CREOG." (R. Facts ¶ 13.) Although the score was below the "mean," it was in line with the results of other first year residents. (*Id.;* Hensleigh Decl. Ex. 56.) Moreover, the primary purpose of this CREOG exam was to evaluate the strength and weaknesses of the residency program. (Hensleigh Decl. Ex. 3.)

### C. Pieszak's Second Year Residency until September 19, 1996.

On July 30, 1996, Pieszak received notice that she did not pass Part III of the United States Medical Licensing Exam ("USMLE"). (R. Facts ¶ 15.) At some point thereafter, she informed Riffel of this result. (Hensleigh Decl. Ex. 6.) [6] Although Pieszak did not request any additional assistance from Riffel, Riffel decided to make changes in the schedule to insure that Pieszak had sufficient study time for the next USMLE scheduled for December 2. (R. Facts ¶ 18.) These changes consisted of ordering the fourth-year residents to give Pieszak priority in scheduling the vacation time to which she was entitled.[7] (Riffel Decl. ¶ 16.) Additionally, Riffel instructed the fourth-year residents to give Pieszak vacation time from November 26 to December 4, 1996. (*Id.*)

In early September, Riffel instructed the fourth-year residents to relieve Pieszak of most of her normal duties on Wednesday mornings and Friday afternoons so that she could study for the USMLE. (R. Facts ¶ 22; Frye Depo. at 354:12—355:9.) Riffel selected these time periods so that Pieszak's study program would have the least impact on other residents. (Frye Depo. 358:7–17, 362:2–21.) Generally, Wednesday mornings were idle time and the clinic was closed on Friday afternoons. (Pieszak Decl. ¶ 17.) Thus, the study program imposed on Pieszak mainly required that she give up her "down" time.

On September 10, 1996, Patrick Johnson, a nurse at GAMC, wrote a memorandum to Riffel describing his concern about the "alarming" and "unquestionably unsafe" manner in which Pieszak was treat-

---

That, in and of itself, is sufficient for this Court to find, on this motion for summary judgment, that no December 1995 evaluation occurred. Nevertheless, Plaintiff also provides GAMC's records which omit any mention of a December 1995 evaluation. (Hensleigh Decl. Ex. 55.)

**5.** Unterseher is one of the faculty members of the residency program.

**6.** There is some dispute as to the exact date that Plaintiff so informed Riffel. Riffel declares that Plaintiff told him on or about July 30, 1996. (*See* Riffel Decl. ¶ 13; *accord* Hensleigh Decl. Ex. 6 (Riffel's notes).) Plaintiff, however, asserts that she did not provide that information on July 30. She does not state on what date she did inform Riffel about the results. However, she did inform Riffel, or GAMC, some time before September 19, 1996. (*See* Hensleigh Decl. Ex. 9 at 5 (Lopez knew of USLME score before September 19, 1996).)

**7.** The fourth year residents controlled the residents' schedules. The GAMC residency program appears to follow a strict hierarchical structure not unlike the military. (Hensleigh Decl. Ex. 2.) The fourth-year residents have substantial supervisory power over the less senior residents. Similarly, third-year residents supervise second and first-year residents and second-years provide guidance to first-years. The fourth-year residents during Pieszak's second year were Lopez and Lance Frye.

ing the clinic's patients.[8] (R. Facts ¶ 26.) However, Riffel did not immediately discuss any of these allegedly "alarming" and "unquestionably unsafe" practices with Pieszak. Indeed, Riffel did not take any immediate action except to place the letter in Pieszak's file.

### D. Events from September 19, 1996 to December 12, 1996.

#### 1. September 19, 1996.

On September 19, 1996, Pieszak gave a morning lecture to the other residents in the program. (Pieszak Decl. ¶ 18.) Lopez arrived late as Pieszak was completing the lecture. He stopped the lecture and ordered Pieszak to start over so that he could hear the lecture from start to finish. He also wanted to know why she did not have a handout available. Finally, he took over the lecture without letting her finish. (*Id.*) Pieszak felt humiliated and demeaned by Lopez' conduct. (*Id.*)

After the lecture, Pieszak reported Lopez' demeaning conduct during the lecture to Riffel. (R. Facts ¶ 28; G. Facts ¶ 12.) She also recounted to him her previous experiences with Lopez:

> Dr. Lopez instructed Plaintiff that she was required to address him as "Dr. Lopez" and he was going to refer to Plaintiff as "Dr. Pieszak" when all the other residents referred to each other by first name; Dr. Lopez ... refused to return Plaintiff's beeper pages with regard to the medical care of patients, in at least one situation endangering the life of a patient; when Plaintiff attempted to discuss the medical care of a patient with Dr. Lopez ... on the telephone, Dr. Lopez would either hang up on Plaintiff, tell her that she was stupid, tell her that he already had gone over 'that' with her before, tell her that she just did not 'get it;' or to ask an attending physician ...; with an intern pres-

ent who Plaintiff was supervising, Dr. Lopez instructed Plaintiff that she could only speak to him [Lopez] with a third person present ...; Dr. Lopez refused to confirm Plaintiff's diagnoses of patients; Dr. Lopez instructed Dr. Pieszak to page him inserting her pager number, so that he could distinguish between Plaintiff's pages and others; Dr. Lopez was continuing to assign Plaintiff work to be performed by an intern, when Plaintiff was a resident; ... Dr. Lopez informed a Unasyn representative, in front of Plaintiff and with other residents present, that Plaintiff had failed Part III of her Medical Boards, and because he was inconvenienced by this, he had the right to tell everyone about it; and Dr. Lopez informed Plaintiff that she could only speak to him in front of third persons.

(Hensleigh Decl. Ex. 9 at 5 (Pl.'s Resp. to Interrogs.).) Pieszak informed Riffel "that [she] could no longer tolerate the verbal abuse and badgering." (Pieszak Decl. ¶ 18.) She also warned Riffel that Lopez' conduct was "harassment." (R. Facts ¶ 28.) Riffel told Pieszak to go the resident's call room, compose herself, and return in the afternoon. (Pieszak Decl. ¶ 18.)

According to Riffel, that very same day, he had a meeting with Lopez and "strongly counseled" Lopez about the seriousness of Pieszak's harassment charge. (Riffel Decl. ¶ 29.) Although he has a note dated September 19 attesting to this conversation, (*see* Riffel Decl. Ex. M), Lopez does not recall any such conversation on that day, (Lopez Depo. at 574:14–18). Indeed, Riffel did not talk to Lopez about Pieszak's complaints anytime before October 1, 1996. (Lopez Depo. at 439:13–21.)

Riffel, however, did conduct a meeting with some of the residents. (Pieszak Decl. ¶ 19; R. Facts ¶ 32.) Riffel met with May,

---

8. Defendants' objection to Pieszak Decl. ¶ 26, (*see* Evid. Objs. to Pieszak Decl. at 4:1–5), is SUSTAINED.

Frye, and Steven Katsuyama[9] to "confer" about Pieszak's complaint about the lecture. (R. Facts ¶ 32.) Pieszak was informed that she was expressly excluded from the meeting. (Pieszak Decl. ¶ 19.) The three residents all stated that Lopez' conduct at the lecture was not harassing or demeaning. (Riffel Decl. ¶ 26.) However, according to Riffel, these residents began to complain about Pieszak. (Riffel Decl. Ex. O.) Specifically, they accused Pieszak of having a bad attitude, being late, being absent, lacking knowledge, and asking repetitive questions. (*Id.*) Riffel requested that they write down their grievances and forward the grievances to him. (*Id.*)

It did not take long before Riffel began receiving grievances against Pieszak. On September 19, Riffel received a report from a third-year resident, Charles Whiting. (R. Facts ¶ 27.) The report purports to chronicle Pieszak's failure to perform a Norplant removal. According to the report, during her first year as a resident, Pieszak refused to perform the Norplant removal on April 24 and May 8, 1996. The report also asserts that an "intern" was teaching Pieszak to perform a Norplant removal on August 14, 1996.[10] (Riffel Decl. Ex. L.) Without addressing the "problem" described in the letter, Riffel merely placed the letter in the Pieszak file.

### 2. September 20 to September 30, 1996.

On September 20, 1996, Riffel wrote a letter to Lopez warning him about Pieszak's accusations. (*Riffel Decl.* ¶ 25.) *Riffel,* however, never actually provided that letter to Lopez. (Lopez Depo. at 437:21–24.) Riffel did briefly show the letter to Lopez sometime after October 1 and then simply placed it in Lopez' file. (*Id.* at 436–37)

Some time after September 19, 1996, Riffel received a letter from Katsuyama. (R. Facts ¶ 14.) Although the letter is dated September 9, 1996, Katsuyama believes he wrote the letter either on September 19 or September 29. (Hensleigh Decl. Ex. 58 at 191.) The letter criticizes Pieszak for conduct that Katsuyama found objectionable. Katsuyama claimed that on July 25, 1996, Pieszak cursed at him and May for changing a recording procedure in a way that would reveal that Pieszak did not see as many patients as May. (Riffel Decl. Ex. I.)

Katsuyama also claimed that he performed a Norplant removal on August 14, 1996 and taught Pieszak how to perform that procedure. (*Id.*) However, Pieszak states that Katsuyama did not teach her how to perform the Norplant removal. Pieszak had learned that procedure at medical school. (Pieszak Decl. ¶ 38.) Furthermore, Pieszak claims that Katsuyama did not perform the Norplant removal; he watched as Pieszak performed the procedure.[11] (*Id.*)

Katsuyama had a series of other complaints which Pieszak explains or rebuts. (*see* Pieszak Decl. ¶¶ 37 & 38.) Moreover, Katsuyama himself is unable to verify all the accusations he leveled at Pieszak. (*See* Hensleigh Decl. Ex. 58.) Unfortunately, Riffel never discussed any of Katsuyama's accusations with Pieszak. (Piezak Decl. ¶ 36.) Instead, he merely placed the Katsuyama letter in Pieszak's file. (*Id.*)

### 3. October 1 to October 21, 1996.

On October 1, 1996, Pieszak returned from her vacation. (Pieszak Decl. ¶ 22.) Riffel immediately summoned her into a meeting with Riffel, Lopez, and Frye. (Pieszak Decl. ¶ 22.) Pieszak was told that the meeting's purpose was to mediate the conflict between her and Lopez. However,

---

9. At the time, Katsuyama was a first-year resident.

10. It appears that "intern" is another term for a first-year resident.

11. Of course, for purposes of summary judgment, the Court accepts Pieszak's version of events.

during the meeting, Riffel lunged at Pieszak and shouted that she was a "prima donna." (*Id.*) Pieszak felt that she was being attacked and attempted to leave. (*Id.*) At that point, Riffel ordered the fourth-year residents out of the office. (*Id.*) Riffel then counseled Pieszak to get professional psychological counseling and offered her a $40 check to cover the co-payment for the first five visits. (*Id.*; R. Fact ¶ 33.) Pieszak refused the check. (Pieszak Decl. ¶ 22.)

According to Riffel, May approached him the following day to complain about Pieszak. (Riffel Decl. ¶ 28.) Riffel made a note of this alleged conversation and placed it in Pieszak's file. (*Id.* at Ex. Q.) Riffel made no effort to mediate the alleged dispute between May and Pieszak and did not confront Pieszak with May's allegations. (Pieszak Decl. ¶ 36.)

That same day, Riffel also received a "Senior Residents Report" signed by Lopez and Frye. (R. Facts ¶ 35.) The report was typed by Lopez. (Frye Depo. 403:11–14.) Lopez and Frye had never before created a Senior Residents Report and had never heard of a Senior Residents Report being prepared. (Frye Depo. 405:7–17.) The report was critical of Pieszak's practices, tardiness, and medical knowledge. Attached to the report were some patient charts showing purported errors. (Riffel Decl. Ex. R.) The senior residents should have discussed with Pieszak any perceived charting errors. (Frye Depo. 424.) No senior resident, however, talked to Pieszak about the errors identified in the report. (*See id.*) Riffel took this report and, again, placed it in Pieszak's file. Riffel made no effort to discuss the allegations in the "Senior Residents Report" with Pieszak.

On October 7, 1996, Whiting approached Pieszak and asked to speak privately with her. (Pieszak Decl. ¶ 23.) He informed her that "he had been told that [Pieszak] was suing the residency and he had been manipulated into" writing the September 19 report. (Pieszak Decl. ¶ 23.)

On October 8, Riffel received a letter from May complaining about Pieszak. (R. Facts ¶ 37.) Riffel placed the letter in Pieszak's file. On October 13, Riffel received another letter from Whiting. (*Id.* at ¶ 38.) Riffel placed the letter in Pieszak's file. On October 15, Riffel received a second memorandum from Johnson. (*Id.* at ¶ 39.) Although Johnson again expressed concerned about the effect of Pieszak's conduct on patients, Riffel merely put the letter in Pieszak's file.

#### 4. *October 22, 1996.*

On October 22, Pieszak met with Riffel, Frye, and Unterseher for her fall evaluation. (Pieszak Decl. ¶ 26.) Pieszak received one written evaluation by Riffel. The evaluation gave her unsatisfactory, low satisfactory, and satisfactory marks. (Riffel Decl. Ex. V.) It also gave an overall performance score of 1.83 with "1" defined as unsatisfactory and "2" as low satisfactory. (*Id.*)

At that meeting, Riffel presented Pieszak with two letters. (Pieszak Decl. ¶ 26; R. Facts ¶ 17.) The first letter was a notice of disciplinary action placing Pieszak on probation. (*See* Pieszak Decl. Ex. K.) The notice gave three reasons for the probation: "Deficient fund of knowledge for [her] level . . . [; i]nability to carry out full responsibility for a [second-year resident; and] . . . [p]romoting an atmosphere that is detrimental to the educational process of [her] fellow residents." (*Id.*) The notice further informed Pieszak that she would receive "periodic evaluations to determine [her] response to this action" and provided some general standards that would be considered. (*Id.*)

The second letter informed Pieszak that "[i]n the event [she did not] pass the USMLE test December 2 and 3, then [her] position in program is [sic] in jeopardy." (Riffel Decl. at ¶ 15 & Ex. J.) Riffel signed both letters.

When Pieszak asked for specific information about her deficiencies, Riffel dis-

closed that he had collected eight letters critical of her conduct. (Pieszak Decl. ¶ 26.) He also accused Pieszak of spreading rumors that Lopez was harassing her because Riffel had received four calls from different departments informing him of Lopez' harassment. (*Id.*) Finally, he showed Pieszak Johnson's first memorandum accusing her of alarmingly unsafe practices. (*Id.* at ¶ 27.) Pieszak noted that the accusations in the letter were false and asked to see the rest of her file. (*Id.* at ¶¶ 27 & 28.) Riffel refused but volunteered that he was maintaining two files on Pieszak: "one with [her] evaluations and one that had 'special' letters and things in it." (*Id.* at ¶ 28.) "Riffel said that he hoped that a year from now that the file could be destroyed 'if everything work[ed] out.'" (*Id.*)

Riffel purportedly based his probation decision on the letters and memoranda he had received. However, he failed to investigate the accusations asserted in these letters. Accordingly, Riffel did not learn that Pieszak's performance in the program was satisfactory. For instance, Michael Frields, M.D., found that Pieszak was "among the best residents that we have had through the years." (Frields Decl. ¶ 2.) Frields reached this conclusion based on his "opportunity to observe and evaluate numerous residents that have progressed through the program." (*Id.*) Frields also found that Pieszak demonstrated surgical and procedural skills, medical knowledge, and interpersonal skills that were above average. (*Id.* at ¶¶ 3 & 4.) In short, "Pieszak demonstrated a degree of progress that place[d] her ahead of the average resident at her level of training" and showed that she "was the most promising of the current group of residents." (*Id.* at ¶¶ 3 & 5.) Frields was the chair of GAMC's OB/Gyn department during the first part of Pieszak's first year and has been associated with the GAMC residency program for over fourteen years.

Ray Iskander, M.D., also found that "Pieszak related well to her and to [his] patients[;] ... consistently did what she was asked to do with a wonderful, positive attitude[; and had] ... surgical skills [that] were well above average." (Iskander Decl. ¶ 2.) Iskander was on the faculty of the OB/Gyn resident program during the time that Pieszak was in the program and he was the Chair of the OB/Gyn department for part of the time that Pieszak was a resident. (*Id.* at ¶ 1.)

These observations were not isolated. Various doctors, including other residency faculty members, found that Pieszak had good interpersonal skills and noted that she had a good bedside manner with patients. (Arslanian Decl. ¶ 2; Aryasingha Decl. ¶¶ 3 & 5; Benedon Decl. ¶ 3; Burton Decl. ¶ 3; Mapp Decl. ¶ 2; Sampson Decl. ¶ 3.) Many of the GAMC doctors also commented that Pieszak had a positive, enthusiastic, and pleasant attitude. (Arslanian Decl. ¶ 2; Aryasingha Decl. ¶ 2; Burton Decl. ¶ 3; Mapp Decl. ¶¶ 2 & 3.) Finally, these doctors complimented Pieszak's medical knowledge and clinical skills. (Arslanian Decl. ¶ 2; Aryasingha Decl. ¶ 4; Benedon Decl. ¶ 3; Mapp Decl. ¶ 2; Sampson Decl. ¶ 3.)

### 5. *October 23 to December 6, 1996.*

On October 23, Riffel received a third memorandum from Johnson. Johnson expressed concern about Pieszak's interaction with "difficult" patients and recommended "[e]valuation and corrective intervention." (Riffel Decl. Ex. Y.) Riffel, however, did not intervene. He merely continued his pattern of simply filing the document in Pieszak's file. (Pieszak Decl. ¶ 36.)

In late October, Pieszak enrolled in a review course to prepare for the USLME test. (Pieszak Decl. ¶ 24.) Riffel accommodated Pieszak with seven days of "conference" although residents typically only get five "conference" days a year. (*Id.*; R. Facts ¶ 19.) Although she received two extra "conference" days, Pieszak was on call on two nights during this conference time. Because of a time conflict between

the review course and her on-call period, Pieszak twice was late in relieving another of the residents. (Pieszak Decl. ¶ 24.) The resident, Henry Chang,[12] berated Pieszak for her tardiness and an argument ensued. (*Id.*) This incident resulted in two letters in November from Chang to Riffel critical of Pieszak. (Riffel Decl. Exs. Z & FF.) As with almost every other letter that Riffel received about Pieszak, Pieszak was never informed of the accusations, no investigation was conducted, and the letter was merely put into the Pieszak file. (*See* Pieszak Decl. ¶ 36.)

Concerned about the secret file that Riffel was creating, Pieszak talked to various attending physicians. (Pieszak Decl. ¶ 30.) She also began to maintain a log book which she had GAMC personnel sign to confirm her time of arrival. (*Id.*) That effort was terminated by Johnson who forbade Pieszak from having anyone but him and one other employee sign the log. (*Id.*) Johnson's instruction made maintaining a log effectively impossible. (*See id.*)

On November 1, Pieszak and her husband met with Leroy Reese, the Chair of GAMC's Graduate Medical Educational Committee. (Pieszak Decl. ¶ 32.) Pieszak expressed her concern about the manner in which she was being treated, her fear that Riffel was actively collecting evidence against her, and her fear that she would not be allowed to survive her probation. (Pieszak Depo. 399–401.) She presented Reese with the names of physicians who had expressed a favorable view of her and asked him to intervene and mediate. (*Id.*) She also asked Reese for assistance in getting into some other residency program that would be more nurturing. (*Id.*) At the time, Reese was unaware that Riffel had placed Pieszak on probation. (Pieszak Decl. ¶ 32.) "Reese informed [Pieszak] that he was placing [her] on a short leave of absence, without repercussions, so that he could talk to people at the residency about what had transpired." (*Id.*) Pieszak was placed on leave from Friday, November 1 to Monday, November 4. (Reese Depo. at 236.)

Unfortunately, this leave had the effect of increasing the other residents' resentment of Pieszak. Lopez, Frye, May, and possibly Whiting with Unterseher approached Reese to express their frustration that Pieszak's leave had placed an extra burden on their functions. (Reese Depo. at 229.) May complained that Pieszak's leave required her to be on call during the weekend. (Reese Depo. at 230.)

On November 5, Pieszak's husband wrote a letter to David Nelson, who was the Chief Operation Officer for GAMC. The letter described Lopez' mistreatment of Pieszak, Riffel's efforts to gather evidence without disclosing any information to Pieszak, and Pieszak's desire to leave the program in good standing. (Pieszak Decl. Ex. H.) Pieszak's husband also wrote a letter to David Igler, GAMC's Vice-President. Neither individual took any action.

On November 25, Riffel received two letters from Frye. (R. Facts ¶¶ 44, 47.) One of the letters indicates that Pieszak erred in ordering a third vaginal ultrasound of a patient. This error was described as "just one of the many mismanagement [sic] of patients with first trimester vaginal bleeding that Dr. Pieszak has continued to make despite intensive proctoring and repetitive instruction." (Riffel Decl. Ex. BB.) Riffel's response: place the letter in Pieszak's file.

As far as Frye remembered, however, the "many mismanagement[s] of patients with first trimester vaginal bleeding" referred to one other incident. (*See* Frye Depo. at 519.) As far as Frye knew, the "intensive proctoring and repetitive instruction" consisted of talking to her briefly about the second incident that prompted the letter. (*Id.* at 521–22, 524–26.)

---

12. Chang was a first-year resident at the time.

The second letter described another erroneous diagnosis by Pieszak. This time, Frye stated that Pieszak's conduct "represent[ed] a clean [sic] cut risk of patient endangerment and subsequent legal action against [GAMC]." (Riffel Decl. Ex. CC.) On November 26, Johnson sent another memorandum addressing the same incident. (R. Facts ¶ 48.) Johnson represented that the patient was threatening legal action. The letter also described a separate incident in which Pieszak supposedly caused a patient unnecessary "bleeding and pain." (Riffel Decl. Ex. DD.) Once again, two persons contacted Riffel to accuse Pieszak of endangering patients and placing GAMC at financial risk. Once again, Riffel believed it would be prudent to simply place the letters in Pieszak's file.

Johnson's letter was not the only letter that Riffel received on November 26. Apparently, four residents felt compelled to write letters to Riffel on that date. November 26 was also the date that Pieszak started her "study vacation." (Riffel Decl. ¶ 16.)

One of the letters was another letter from Katsuyama. In this letter, Katsuyama expressed his disdain for Pieszak's ability and knowledge. (R. Facts ¶ 49.) Interestingly, according to Katsuyama, he had been away from GAMC and at White Memorial Medical Center since September. (Riffel Decl. Ex. EE.) Thus, he apparently did not have any residency-related contact with Pieszak since September. However, his belief that he, a first-year, had taught Pieszak, a second-year, how to conduct a Norplant removal in August made a lasting impression on him. After spending three months "pondering" the Pieszak situation, he determined that his "educational goals could not be fulfilled" as long as Pieszak was part of the residency program. (Riffel Decl. Ex. EE.) Katsuyama concluded, "I literally abhor the thought of returning to [GAMC] and having to work alongside Dr. Pieszak." (Id.)

Chang also wrote a short letter, which again repeated his perception that Pieszak's conference schedule and tardiness forced him to work extra hours. (Riffel Decl. Ex. FF.) The letter also attacked Pieszak's knowledge and skills and blamed Pieszak for creating a "very difficult" "working and learning environment." (Id.) Chang concluded, "It will be of great benefit for my graduate medical training if the situation can be remedied." (Id.)

May wrote the third letter. She describes her letter as "a plea to improve the residents' academic environment." (Riffel Decl. Ex. GG.) In her opinion, the whole cause of the strained environment was Pieszak. (Id.)

Whiting also wrote a five-page letter which Riffel describes as "extremely remarkable." (Riffel Decl. ¶ 46.) It describes a "toxic environment" which, as expected, the author opines is caused by Pieszak. Whiting describes Pieszak as untrustworthy, irresponsible, incompetent, unteachable, divisive, and an embarrassment to the program. (Id. at Ex. HH.)

All these November 26 letters cry out: terminate Pieszak. However, Riffel did not interview any one, "counsel" these residents, or conduct any investigation. Instead, after Pieszak returned from her "vacation" on December 5, Riffel terminated her.

### 6. The Termination.

On December 6, Riffel, Untersher, Frye, and Lopez evaluated Pieszak. She received two satisfactory marks from these four individuals and the remaining marks were all unsatisfactory or low satisfactory. (Riffel Decl. Exs. II–NN.) Her average score was 1.47, placing her solidly in the unsatisfactory column. (Id.) Riffel did not bother to show these evaluations to Pieszak; he just placed them in her file. (Pieszak Decl. ¶ 36.)

That same day, Riffel called Pieszak into his office and fired her. (Pieszak Decl. ¶ 34.) Riffel told her that she and her husband had made a mistake by writing a letter to Nelson. (Pieszak Depo. at

854:12–17.) According to Riffel, however, she was terminated for "her deficient fund of medical knowledge, poor patient care, and poor attitude." (R. Facts ¶ 57; *see also* Riffel Decl. ¶ 49.) Riffel also offered that he could write a better letter of recommendation for Pieszak if she just resigned. (*Id.*) Pieszak refused.

Riffel's summary dismissal of Pieszak violated GAMC's process for firing personnel. (Froberg Depo. 76.) The process required two different tiers of hearings and notification to the Educational Director, Georgia Froberg, and the medical director, Reese. (*Id.*) Riffel failed to take any of these steps.

Pieszak immediately contacted Reese, who told her he was ignorant of Riffel's actions. (Pieszak Decl. ¶ 34.) Pieszak then hired an attorney. (*Id.*) On December 12, 1996, Pieszak received a letter from Riffel terminating her effective January 12, 1997. (Riffel Decl. ¶ 49 & Ex. NN.)

The letter stated that the termination was "pursuant to Section 5.05 of the Agreement." (*Id.* at Ex. NN.) In the interim, she was placed on administrative leave. (*Id.*) The letter also stated:

> In accordance with Sections 5.04 and 5.05 of the Agreement and the Program's Fair Hearing Procedure, you have the right to request a Residency Program Hearing regarding the termination of the Agreement. At such a hearing, you would be permitted to appear before a committee of three Program faculty to present your position. A copy of the Fair Hearing Procedure, which consists of page 12 of the Program's House Staff Manual, is attached for your reference.
>
> If you wish to request a Residency Program Hearing, your written request for the hearing must be received in my

office by no later than 5:00 p.m. on Thursday, December 19, 1996.

(*Id.*)

### E. The Post–Doctoral Training Agreement.

The contract governing Pieszak's second-year residency is entitled the "Post–Doctoral Training Agreement" ("PDTA"). Section 5.05 of the PTDA provides that "[e]ither party may terminate this Agreement with or without cause at any time during the term hereof upon thirty (30) days, written notice to the other party. . . . Said termination shall have no effect upon Resident's right to a fair procedure hearing if applicable upon termination hereof." (G. Facts ¶ 3.)

Under the PDTA, a resident, "upon suspension or termination," is entitled to "the procedure, if any, required under California law." (*Id.* at ¶ 6.) The contract provides two exceptions to this right. (*Id.*) A resident terminated because of his or her failure to obtain the necessary medical licenses is not entitled to a hearing. (*Id.* at ¶¶ 5 & 6.) The second exception is where a resident is terminated because he or she did not satisfy certain personal and educational requirements before entering the program. (Riffel Decl. Ex. E at § 2.02.)

Finally, the PDTA contains an integration clause: "Resident and Hospital agree that neither party has made any representations, warranty or covenant not set forth herein, and that this Agreement is a complete statement of the entire Agreement which supersedes all previous communications between the parties hereto." (G. Facts ¶ 4.)

### F. Post–Termination Events.

Pieszak requested the hearing to which she was entitled. (Hensleigh Decl. Ex. 43.) GAMC never held any such hearing.[13]

---

**13.** The Court notes that Defendants present some evidence in their replies supporting an inference that a hearing was held or that Pieszak abandoned the hearing procedure. Although the SAC repeatedly asserts that Pieszak did not get a hearing, (SAC ¶¶ 53, 56, 108), Defendants did not challenge those allegations in the initial motion papers. Accordingly, at best for Defendants, their reply evidence merely creates a genuine issue for trial.

(Pieszak Decl ¶ 35.) Instead, on January 14, 1997, Riffel offered Pieszak's position to another female doctor, Diep Nguyen. (Hensleigh Decl. Ex. 44.) Nguyen began as a second-year resident in late January 1997. (Nguyen Decl. ¶ 5.)

On May 5, 1997, Pieszak applied to the California Medical Board for a license to practice medicine. (Pieszak Decl. in Supp. of TRO ¶ 6.) On June 26, 1997, Pieszak filed suit. On July 1, 1997, Pieszak entered a residency program at the University of Southern California.

On July 31, 1997, the Medical Board sent a letter to Pieszak indicating certain deficiencies in her application. (Pl.'s Supp. Ex. 3.) [14] The letter stated that Pieszak needed to have GAMC release documents concerning employment history directly to the Medical Board. (*Id.*) In response to this letter, on August 10, Pieszak sent letters to Riffel and GAMC requesting that they forward this material directly to the Medical Board. (Pl.'s Supp. Exs. 4 & 5.) When, in the second part of August, the Medical Board had not received anything from GAMC, it sent a letter directly to GAMC requesting the information. (Hensleigh Decl. Ex. H ("Park Decl.") ¶ 5.)

On September 24, 1997, GAMC sought to have Pieszak sign a form releasing GAMC from liability for forwarding the documents to the Medical Board. (Defs.' Supp. Ex. 4.) The release form required Pieszak to

> release and forever discharge [GAMC], its representatives, agents, employees, medical staff members, officers and directors ... from any and all actions, causes of action, obligations, costs, expenses, attorneys' fees, damages, losses, claims, liabilities and demands of whatsoever nature, character and kind, whether known or unknown, suspected or unsuspected, matured or contingent,

> which I now own or hold or at anytime hereafter own or hold [sic] *arising out of or resulting from the disclosure of the information* ... to the Board or to its representatives.

(*Id.* (italics added).)

Pieszak, however, refused to sign the release on the ground that the release would allow GAMC to "lie about her to the Medical Board with impunity." (Defs.' Supp. Ex. 5.) In response, on October 6, GAMC simply sent the documents requested by the Medical Board to Pieszak's attorney, Barbara Hensleigh. (Pl.'s Supp. Ex. 7.) Hensleigh kept a copy of the documents and returned the documents to GAMC's attorney on October 23, 1997. (Def.'s Supp. Ex. 7.) Pieszak, through her attorney, stated that she would "not participate in supplying false information to the Medical Board" and that she would "not waive the right she has to require GAMC to provide accurate information to the Medical Board." (*Id.*) As Pieszak saw it, "GAMC ha[d] the obligation to conduct a reasonable investigation of the facts and to provide accurate information to the Medical Board." (*Id.*)

Although Hensleigh kept a copy of the documents, she did not initially forward a copy of the documents to the Medical Board. (Park Decl. at ¶ 8.) Hensleigh did not forward them to the Medical Board because she and Pieszak believed that the documents "contained false information," (Pl.'s Supp. Ex. 8), and because Hensleigh was aware that the Board required documentation directly from the primary source, GAMC, (Hensleigh Supp. Decl. ¶ 9). Eventually, at the request of the Medical Board's representative, Hensleigh forwarded the documents on December 24, 1997, over two months after she had received them. (Park Decl. at ¶¶ 7 & 8.)

---

**14.** At the hearing on these motions, the Court permitted the parties to submit supplemental evidence and briefing on the issue of the release of documents to the Medical Board. "Pl.'s Supp." refers to Plaintiff's supplemental evidence and "Defs.' Supp." refers to Defendants' supplemental evidence. The Court, however, notes that most of the supplemental evidence is the same and, therefore, undisputed.

The documents from Hensleigh, however, proved insufficient. On December 31, 1997, the Medical Board sent a letter to Pieszak stating that it could not grant her license without receiving "primary source" documentation. (Pl.'s Supp. Ex. 6.) The Medical Board also prohibited Pieszak from continuing in her residency program at USC effective the very next day. (*Id.*)

On January 9, 1998, the Court granted Pieszak's Temporary Restraining Order against the Board and allowed Pieszak to continue in USC's residency program. (Defs.' Ex. 1.) On January 13, 1998, the Medical Board served a subpoena on GAMC for Pieszak's records and other documents. (*Id.*) On January 26, in a preliminary injunction order, the Court found that the Board had failed to provide Pieszak with due process in its review of her application and its decision to preclude her participation in the USC residency program. The Court, therefore, enjoined the Medical Board from prohibiting Pieszak's participation in the USC residency program, pending a proper review of Pieszak's application. (*Id.*) After reviewing Pieszak's file, the Board issued a medical license to Pieszak on May 4, 1998. (Pl.'s Ex. 11.)

In February 1998, Dr. Leah Heap, a resident at USC, was contacted by a Dr. Kessler, who claimed to be a "friend of the attorney that is representing" GAMC. (Heap Depo. at 27.) Kessler asked Heap, "Do you have any resident that you think is very incompetent in your program?" (*Id.* at 26.) Pieszak's name never came up in the conversation. (*Id.* at 29.) Because Kessler stated that one of the USC residents was suing GAMC, Heap made the assumption that Kessler had questions about Pieszak. (*Id.* at 28–29.)

On February 14, 2000, Riffel filed a letter in support of his summary judgment motion. The letter purports to be written on May 19, 1996 from May to Riffel complaining about Pieszak. (Riffel Decl. Ex. AA.) Apparently, this letter never made it into Riffel's Pieszak file. (Pieszak Decl. ¶ 36.) This letter was also not previously disclosed to Plaintiff or her counsel, even though the letter was responsive to discovery requests. (*Id.*; Hensleigh Decl. ¶ 3.) Needless to say, Riffel never discussed May's accusations in that letter with Pieszak. And Riffel did not conduct any investigation into May's accusations.

### G. Evidence of Pieszak's Misconduct.

Although Defendants point to the variety of complaints found in Riffel's special Pieszak file, they fail to support the complaints with corroborative or documentary evidence.[15] Moreover, there is a genuine issue of fact as to the conduct of Pieszak.

For instance, May testified that Pieszak encouraged her not to go to certain conferences during May's emergency medicine rotation because then Pieszak would "have to go when [she was] doing emergency medicine." (May Depo. at 390:14–22.) Pieszak, however, testifies that she never made these statements. (Pieszak Decl. ¶ 41.) Accordingly, on a summary judgment motion, the Court assumes that this incident never happened.

Defendants, however, present undisputed evidence that Pieszak "would become upset in the clinic and leave, and no one would know if she was coming back, when she was coming back." (May Depo.391:3–7.) These incidents occurred about three times during Pieszak's second year. (*Id.* at 391:17–20.)

### H. Treatment of Other Residents.

Various male GAMC residents' have committed serious medical error or have been accused of mistakes and deficiencies but were not terminated or disciplined.

One patient who was pregnant with twins was admitted to the hospital at 1

---

15. Thus, to the extent that Plaintiff has lodges hearsay objections to the letters written by the other GAMC residents, the Court DENIES those objections but notes that the letters are not being admitted for the truth of the matter asserted.

a.m. Both babies were dead, however, by 7 a.m. that morning. Chang was responsible for the treatment of this individual. Whiting saw the patient one time that night. Twin pregnancies are considered high risk pregnancies and, therefore, an attending physician or a senior resident should be involved in medical decisions concerning such a patient. Chang, however, never contacted a senior resident or attending physician. He was never disciplined. (Russo Decl. Ex. 1 at 5.)

Frye ordered a narcotic pain medication and "Taradol" for a breast-feeding patient who had just come out of an operation. Hospital policy, however, prohibited narcotic pain medication within 24 hours of an operation. Similarly, Taradol should not have been given to a breast-feeding mother. Frye was not disciplined. (*Id.*)

When GAMC determined that Dr. Dennis' progress was deficient, the staff "counseled" him. After the intiial contact, Dennis received a letter identifying departmental expectations. Approximately three weeks later, Dennis received a second letter describing his progress and providing additional expectations. Dennis was never placed on probation nor was he terminated. (*Id.* at 5.)

Several residents have been sued in medical malpractice suits and were not placed on probation or terminated. (*Id.* at 6.) Other residents and even Riffel ordered ultrasounds that were unnecessary. None of these residents were disciplined for their "mismanagement." (*Id.* at 8.) Other residents failed to properly advise patients about recommended testing without criticism. (*Id.* at 8–9.) GAMC's residents are frequently late and occasionally miss conferences. (*Id.* at 10–11.) None have been terminated because of these problems.

Lopez was written up three times. In his first year, Lopez used a gel on a patient that, under the circumstances, was dangerous and could have caused serious problems for the fetus. Lopez' action violated written hospital policy and was "contraindicated." During his second year,

Lopez mistreated a patient in the Emergency Room and misrepresented his care on the patient chart. This incident resulted, by GAMC's own evaluation, in a "very significant breakdown of confidence" between Emergency Department staff and the residency program. In his fourth year, Lopez raised his voice at an operating room nurse for not having the type of gloves he liked. (*Id.* at 6–7.) Lopez also recommended the wrong treatment for another patient, (*Id.* at 9), and mistreated much of the hospital staff, (*E.g.*, Agunbiade Decl. ¶ 7.) Lopez received a diploma from the residency program.

## IV. Analysis

### A. Title VII Claims.

Pieszak alleges that GAMC's treatment of her constitutes gender discrimination, sexual harassment, and retaliation precluded by Title VII of the Civil Rights Act of 1964. In a Title VII claim, the allocation of burdens follows a three-step process:

> [A] plaintiff must first establish a prima facie case of discrimination. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory.

*Lowe v. City of Monrovia,* 775 F.2d 998, 1005 (9th Cir.1985) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *accord Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 916 (9th Cir.1996); *Heyne v. Caruso,* 69 F.3d 1475 (9th Cir.1995).

### 1. Gender discrimination claim.

Pieszak contends that her termination was motivated by impermissible gender discrimination. In contrast, GAMC asserts that Pieszak cannot assert a gender discrimination claim because she cannot (1) establish a prima facie case of gender dis-

crimination, or (2) rebut GAMC's purportedly legitimate reasons for terminating her.

### a. Pieszak's prima facie case.

"In order to show a prima facie case of discrimination, a plaintiff must offer evidence that gives rise to an inference of unlawful discrimination." *Nidds,* 113 F.3d at 917 (internal quotations omitted). On a motion for summary judgment, the degree of proof required for a prima facie case "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994). The prima facie case may be based on (1) direct or circumstantial evidence of discriminatory intent or (2) a rebuttable presumption of discrimination arising from the factors set forth in *McDonnell Douglas.*[16] *Schnidrig v. Columbia Machine, Inc.,* 80 F.3d 1406, 1409 (9th Cir.1996).

### i. The "direct" evidence by itself is insufficient.

Pieszak presents evidence that, according to her, directly shows that her termination was a result of gender discrimination. Pieszak's "direct" evidence, however, is by itself insufficient. Pieszak presents no actual direct evidence showing that she was fired because of her gender. Riffel never commented that she was being fired because she was a woman and Pieszak cannot point to a single incident or statement showing gender bias during her second year in residence. She refers to crude comments made by residents and purportedly tolerated by Riffel but fails to provide

the dates of most of these incidents. Pieszak does identify some statements that were made at the beginning of her first year and before she started in the program. The most severe of these statements is Lopez' statement that Riffel did not want his female residents to get pregnant during the program. Because of the time gap between that statement and Pieszak's termination, however, the connection between the two is too attenuated to create direct evidence.[17] None of the statements that she has identified have more than an attenuated contact with her termination.

Moreover, Pieszak claims that Riffel terminated her for complaining to Riffel about Lopez' harassment and to Nelson about Riffel's inept handling of her initial complaint. However, the Court finds that these complaints had nothing to do with sexual harassment. *See infra* § IV.A.3. No reasonable jury could find that Pieszak was fired because of her gender based on this attenuated evidence.

### ii. McDonnell–Douglas factors.

No party bothered to describe the specific *McDonnell Douglas* factors that apply to a termination based on gender discrimination. However, the Court has surmised two different tests that it could apply to termination cases. Under the first one, Pieszak would have to show that "(1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably."

---

**16.** *McDonnell Douglas* involved a claim of racial discrimination in violation of Title VII. The Court held that a plaintiff can establish a rebuttable presumption of discrimination by showing "(i) that [the plaintiff] belongs to a racial minority; (ii) that [the plaintiff] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [the plaintiff's] qualification, he [or she] was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from

persons of complainant's qualifications." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The Court noted that the test it created depended on the specific facts of the case at issue and that the specifications for a prima facie case would vary based on the facts of the case. *Id.* at 802, n. 13, 93 S.Ct. 1817.

**17.** Moreover, she was not fired because Riffel thought that she was pregnant.

*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir.1998).

The second test would require a showing that the position "remained open and was ultimately filled by a [male]" instead of simply showing that others received more favorable treatment. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). GAMC relies upon this second test. (*See* GAMC's Memo. In Supp. of Summ. Judgmnt. Mot. ("GAMC's Mot.") at 6–7.) The Court, however, finds that the first test is appropriate for three reasons.

■ First, the Ninth Circuit has held that "[s]ubsequent hiring or promotion practices are clearly not relevant to the question of whether discrimination occurred prior to the commencement of a Title VII action." *Gonzales v. Police Dep't,* 901 F.2d 758, 762 (9th Cir.1990). Although the employment action here was not taken subsequent to the filing of this Title VII action, it was taken subsequent to Pieszak's attorney's initial contact with GAMC. Although the record is somewhat unclear, it is possible that Pieszak's attorney broached the topic of Title VII liability. Second, the Ninth Circuit has held that a Title VII claim is not precluded merely because the plaintiff was replaced by someone of the same protected class. *See Diaz v. American Telephone & Telegraph,* 752 F.2d 1356 (9th Cir.1985). Finally, the focus of the fourth factor is not on the person, if any, who replaced the plaintiff, but on whether the position was still available. *See id.* at 1359; Barbara Lindemann & Paul Grossman, *Employment Discrimination Law,* Vol. 1 at 16 (3d ed. 1996) ("Establishing a prima facie case under the *McDonnell Douglas* ... model creates a presumption of illegal discrimination because it eliminates the most likely legitimate explanations for the employer's adverse action, such as lack of

qualification and the absence of a job opening"). Thus, the Court finds that the fact that Pieszak was replaced by another female is irrelevant to determining whether the *McDonnell Douglas* factors are met.

### iii. Applying the McDonnell–Douglas factors.

■ The parties do not dispute that Pieszak is a member of a protected class or that the termination was an adverse employment action. GAMC, however, argues that Pieszak cannot show that her performance was satisfactory. GAMC relies on Pieszak's failure to pass Part III of the USMLE, Pieszak's negative evaluations in October and December 1996, and the complaint letters received by Riffel. Moreover, GAMC asserts that Pieszak's reliance on her first year evaluations is insufficient to show satisfactory performance. (GAMC Mot. at 4.) Pieszak, however, does not rely solely on her first year evaluations. She points to the declarations of some of the physicians with whom she worked to show that she was performing up to expectations.[18] Thus, for purposes of summary judgment, Pieszak has refuted the negative evaluations and the critical letters.

Moreover, the facts surrounding the USMLE support an inference that GAMC was willing to waive Pieszak's initial failure to pass the test. As late as October 22, 1996, Pieszak was informed that her job was in jeopardy *if she did not pass the next examination in December 1996.* GAMC also learned about Pieszak's results three to five months before terminating her. It would be anomalous to allow GAMC to assert that Pieszak's failure to pass the USMLE meant that she failed to meet its legitimate expectations when its representatives allowed her to continue working for months after learning about the results.

18. GAMC argues that the Court should disregard the declarations of these physicians because the extent of the their working relationship with Pieszak is unclear. All the physicians indicate that they worked with Pieszak. The extent of that working relationship goes to the weight of the evidence, which should be determined by a jury.

■ Pieszak also presents evidence that residents similarly situated to her had not been terminated from the program, thereby satisfying the fourth *McDonnell Douglas* factor. Pieszak presents evidence that various other residents, including Whiting, Chang, Frye, and Lopez, had committed serious clinical errors for which they were not reprimanded. Lopez was also written up three times but was not terminated or even disciplined. Another resident, Dennis, was counseled about his deficiencies and received letters informing him of departmental expectations and his progress. He, however was never placed on probation or terminated.[19]

Pieszak, therefore, satisfies her burden of showing a prima facie case of gender discrimination.

### b. GAMC's reason for terminating Pieszak.

Because Pieszak has shown a prima facie case of gender discrimination, the burden shifts to GAMC to offer evidence that "the adverse action was taken for other than impermissibly discriminatory reasons." *See Wallis*, 26 F.3d at 889. Once the employer meets this burden, any presumption of discrimination drops away. *Nidds*, 113 F.3d at 917.

GAMC has come forward with an explanation. Riffel informed Pieszak that she was terminated for "her deficient fund of medical knowledge, poor patient care, and poor attitude." (R. Facts ¶ 57.) As support for this decision, GAMC points to the numerous sources reporting "deficiencies in plaintiff's medical knowledge, performance, judgment, attitude, and conduct[;]" Pieszak's failure to pass the medical boards and to obtain her medical license; and Pieszak's lack of improvement during her probation. (*See* GAMC's Mot. at 7–8.)

19. Based on the facts presented by this case, the evidence concerning the treatment of others is also related to GAMC's legitimate expectations. Thus, while GMAC could expect a resident to perform at a certain level, it cannot legitimately require a higher level of performance only for its female residents.

### c. Pieszak's Burden to Establish Pretext.

Because GAMC has come forth with evidence that Pieszak was terminated for a nondiscriminatory reasons, the burden shifts back to Pieszak to "raise a genuine factual issue as to whether the articulated reason[s were] pretextual." *Sischo–Nownejad v. Merced Comm. College*, 934 F.2d 1104, 1110 (9th Cir.1991). "To satisfy [this] burden, and survive summary judgment, a [plaintiff] must produce enough evidence to allow a reasonable factfinder to conclude either: (a) that the alleged reason for [the] discharge was false, or (b) that the true reason for [the] discharge was a discriminatory one." *Nidds*, 113 F.3d at 918. A plaintiff must produce specific, substantive evidence of pretext to avoid summary judgment. *Wallis*, 26 F.3d at 890–91; *Nidds*, 113 F.3d at 918–19. Alternatively, a plaintiff need only produce "very little" "direct evidence of discriminatory motive." *Godwin*, 150 F.3d at 1221.

In determining whether a plaintiff has satisfied its burden to raise a genuine issue of fact, the court "must look at the evidence supporting the prima facie case, as well as the other evidence offered by the plaintiff to rebut the employer's offered reasons." *Wallis*, 26 F.3d at 890. Thus, " a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, —— U.S. ——, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000).

■ Here, Plaintiff creates a genuine issue of fact concerning whether GAMC's reasons for the termination were a pretext.

*See Shager v. Upjohn Co.*, 913 F.2d 398, 403 (7th Cir.1990) ("An employer can fire a worker for being uppitty ... [b]ut if the employer would not fire an uppitty worker unless he was also an old worker ... then age would be a causal factor in the worker's termination").

Indeed, the evidence used to establish the prima facie case, both as to the disparate treatment and Pieszak's qualifications, creates that genuine issue of fact.

Furthermore, there is no logical explanation for Riffel's handling of the letter and complaints; his inexplicable behavior, therefore, supports an inference of pretext. Although the complaints accused Pieszak of seriously endangering the lives of GAMC's patients, Riffel did not investigate or follow-up on these complaints. Even when Pieszak requested information about her purported deficiencies, Pieszak failed to disclose the information in these letters. Additionally, Riffel failed to provide any feedback or progress reports during Pieszak's probationary period and he failed to follow GAMC's own procedural requirements in terminating Pieszak. Further still, the timing in which all but one of the letters were sent after Pieszak's complaint and the sudden emergence of one letter this year is troubling. Collectively, the evidence and inferences create a question as to the veracity of GAMC's reasons for termination.

Finally, Pieszak also can rely on the gender-related conduct, remarks, and statistics to show that she was a victim of intentional discrimination. GAMC asks this Court to ignore these comments and conduct because they were stray remarks and had no connection with the termination. However, a court cannot "impermissibly substitute[ ] its judgment concerning weight of the evidence for the jury's." *Reeves,* —— U.S. at ——, 120 S.Ct. at 2111. In *Reeves,* the Supreme Court concluded that the Fifth Circuit had made that very error by "discount[ing discriminatory comments] on the ground that they 'were not made in the direct context of Reeve's termination."' *Id.* (citing appellate court opinion). Thus, a stray remark "may fall far short of establishing a prima facie case," but that remark still "may be relevant evidence, with greater or

less probative value depending on the precise character of the remark." *Shager v. Upjohn Co.,* 913 F.2d 398, 402 (7th Cir. 1990); *Godwin,* 150 F.3d at 1221 (finding that direct evidence of general discriminatory animus toward other women in workplace supported inference of discrimination in the specific employment decision at issue); *Warren III v. City of Carlsbad,* 58 F.3d 439, 443–44 (9th Cir.1995) (finding that derogatory race-based comment, along with other evidence, created genuine issue of fact as to hiring motive). Thus, sexist, "derogatory comments can create an inference of discriminatory motive." *Cordova v. State Farm Ins. Cos.,* 124 F.3d 1145, 1149 (9th Cir.1997).

Additionally, GAMC's non-discriminatory explanation for the statistical evidence showing a gender disparity between its program and the national average is insufficient on a motion for summary judgment.

Statistical data is relevant because it can be used to establish a general discriminatory pattern in an employer's hiring or promotion practices. Such a discriminatory pattern is probative of motive and can therefore create an inference of discriminatory intent with respect to the individual employment decision at issue.

*Diaz,* 752 F.2d at 1363. Although GAMC appears to argue that the statistical evidence is highly deceptive, it does not contend that the statistical record is inaccurate. Accordingly, a trier of fact may consider the information. *See id.; Warren,* 58 F.3d at 443–44.

Thus, although this "direct" evidence by itself is too attenuated to support a claim of intentional discrimination, it can be used as evidence, in addition to the *McDonnell Douglas* prima facie case and the evidence of pretext, that the discharge was motivated by discriminatory intent. Pieszak, therefore, satisfies her burden of showing the existence of a genuine issue of fact as to whether GAMC's true reason for the termination was gender discrimination.[20]

---

20. That a claim survives summary judgment

does not necessarily mean that a claim has a

### 2. Sexual Harassment Claim.

Pieszak also alleges that the male residents created a work environment that was hostile to females in the program. GAMC contends that Pieszak cannot show that sexual harassment at GAMC was sufficiently severe or pervasive to create a hostile work environment.

"Title VII is violated if sexual harassment is so severe or pervasive as to create a hostile work environment." *Kortan v. California Youth Authority,* 217 F.3d 1104, 1109 (9th Cir.2000). Sexual harassment claims usually do not fall neatly into the framework provided by *McDonnell Douglas.* Nevertheless, "a female plaintiff states a prima facie case of hostile environment sexual harassment when she alleges conduct which a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Ellison v. Brady,* 924 F.2d 872, 879 (9th Cir.1991) (footnotes omitted). Moreover, the "harassing conduct need not be motivated by sexual desire." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). A plaintiff can show a violation of Title VII if the harassing conduct is "motivated by general hostility to the presence of women in the workplace." *Id.* Finally, the conduct must be unwelcomed. *Ellison,* 924 F.2d at 880.

█ Thus, an employee establishes a prima facie case where the employee proves "(1) that he [or she] was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Kortan,* 217 F.3d 1104, 1109.

The Court's evaluation should focus on Title VII's goal of prohibiting an environment where "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale,* 523 U.S. at 80, 118 S.Ct. 998. The context, therefore, is highly relevant in determining whether a plaintiff states a sexual harassment claim. *Id.* at 81–82, 118 S.Ct. 998. Accordingly, a Court must look "at all the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance." *Kortan,* 217 F.3d 1104, 1109.

This case presents a not so unusual twist in evaluating GAMC's work environment. GAMC is not only a work environment; it is also a training environment. As part of the training environment, GAMC has adopted a hierarchical, antagonistic teaching style that teaches by criticizing and demeaning the junior residents. Thus, the program apparently creates an abusive environment for all junior residents.

Pieszak was subject to a barrage of harassing conduct. The problem, however, is that the substantial majority of that barrage was not connected to sex or gender. Although the harassment need not be of a sexual content, Pieszak must present some evidence that ties the conduct to gender. For the most part, she fails to do so.

█ For instance, Pieszak argues that she was subject to "a daily onslaught of abuse by Dr. Lopez based upon her gender." (Pl.'s Opp. to GAMC Mot. at 19.) She, however, fails to present evidence of this daily onslaught. Pieszak merely identifies about fifteen to twenty different incidents over an eighteen-month period in which residents, mainly Lopez, made some

significant chance of success at trial, especially in the Title VII arena. Both the Ninth Circuit and the Supreme Court in *Reeves* have pointed out that the standard for surviving summary judgment in a Title VII claim is

fairly low. The Court encourages Plaintiff and her counsel to keep this low standard in mind in connection with the Rule 23 settlement proceedings.

comment in reference to sex or gender. (*See supra* pp. 976–77.) These comments were clearly inappropriate and in bad taste. However, the conduct does not rise to the level of sexual harassment prohibited under Title VII.

Although Pieszak cites *Lipsett v. University of Puerto Rico,* 864 F.2d 881 (1st Cir.1988) as supportive of her sexual harassment claim, the instant case does not come close to the showing presented in *Lipsett,* which also involved a residency program. In *Lipsett,* the males dramatically outnumbered the females and the facilities for the male residents were substantially superior to the facilities for the female residents. *Id.* at 887. From the start, Lipsett was informed by the chief resident that "surgery was a male preserve not hospitable to women" and warned that any complaints that she might have about this fact would result in her dismissal as had happened to a previous female resident. *Id.* From that point on, she was subject to sexual comments, putdowns of female residents and surgeons, differing treatment from the male residents, public declarations by the chief resident that he sought to have all women eliminated from the program, the posting of *Playboy* centerfolds in the residents' rest facility, the posting of a sexually explicit drawing of her body, being labeled with a sexually explicit nickname, and quid pro quo sexual harassment. *Id.* at 887–889. Lipsett also presented evidence that many other female residents had been subjected to similar mistreatment in the program. *Id.* at 888.

*Lipsett* presents a rather extreme example of sexual harassment. A plaintiff clearly does not have to make that type of showing to assert a viable sexual harassment claim. But, to the extent that Pieszak implies that she has made a showing as strong as that in *Lipsett,* she is wrong.

The showing of misconduct presented here is more analogous to the Ninth Circuit's recent decision in *Kortan.* In *Kortan,* the plaintiff's supervisors, Atelsap, made various offensive comments with reference to gender and sex. *Kortan,* 217 F.3d 1104, 1106. Atelsap also took some actions that undermined the authority of the plaintiff but which did not appear to be motivated by gender bias. *Id.* After the plaintiff complained about the gender-based comments, Atelsap directed some insults at the plaintiff. The Ninth Circuit affirmed summary judgment in favor of the defendant because the conduct was "simply not of [the] order of magnitude" such that a jury would find that the conduct was sufficiently severe or pervasive to alter the conditions of employment. *Id.* at 1111.

After a thorough review of the evidence in this case, the Court finds that no reasonable jury would conclude that the conduct identified by Pieszak is sufficiently severe or pervasive to constitute sexual harassment prohibited by Title VII. The Court, therefore, GRANTS summary judgment in favor of GAMC on Pieszak's sexual harassment claim.

### 3. Retaliation claim.

#### a. Prima facie claim.

■ In a retaliation claim, a plaintiff establishes a prima facie case by showing "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brooks v. City of San Mateo,* 214 F.3d 1082, 1091 (9th Cir.2000); *accord Wallis,* 26 F.3d at 891.

Pieszak identifies four GAMC actions that constitute retaliation: placing her on probation, terminating her, refusing to provide documents to the California Medical Board so plaintiff could obtain her medical license, and defaming her to a colleague in the USC residency program.

■ Pieszak, however, does not assert a prima facie case as to the probation or termination because she does not point to any involvement in a protected activity. Pieszak argues that the termination was

Riffel's retaliation against her for complaining about her "harassment" to Riffel and Nelson. The fact that Pieszak was complaining about Lopez' harassment does not mean that she was complaining about sexual harassment. Not once, on September 19, or in any of her subsequent complaints before filing the lawsuit, did Pieszak mention "sex", "gender", or any incident that would have disclosed that Lopez' harassment had anything to do with sex or gender bias. (*See supra* pp. 978–83.) Similarly, the letter to Nelson does not claim that Pieszak had been subject to "sexual harassment." Accordingly, Pieszak cannot show that the probation or termination were retaliatory conduct prohibited by Title VII.

■ As to the defaming contact, Pieszak points to testimony that a fellow USC resident, Dr. Heap, was contacted by a Dr. Kessler, who claimed to be a "friend of the attorney that is representing" GAMC. (Heap Depo. at 27.) Kessler asked Heap about the competency of the USC residents but Pieszak's name never came up. Heap made the assumption, possibly correctly, that Kessler had questions about Pieszak. (*Id.* at 28–29.) However, Pieszak points to no evidence showing that Kessler is a representative of GAMC. Thus, this evidence wholly fails to show that this contact is an action, let alone an adverse employment action, taken by GAMC.[21] Pieszak, therefore, fails to make a prima facie showing that the purported "defamatory" contact with Heap was retaliatory conduct in violation of Title VII.

Pieszak does make a prima facie case as to GAMC's failure to forward documents to the Medical Board. She identifies a protected activity: filing this action.

■ The failure to forward the documents could also constitute an adverse employment action. "A plaintiff may seek relief for retaliatory actions taken after

her employment ends if the alleged discrimination is related to or arises out of the employment relationship." *Hashimoto v. Dalton*, 118 F.3d 671, 675 (9th Cir.1997). Here the document request does relate to Pieszak's previous employment relationship with GAMC. The Medical Board needed information about her GAMC employment to determine whether to grant her medical license.

Finally, Pieszak can point to a causal link between the two. The failure to forward the medical records occurred after she filed the complaint. This order of events establishes a link, although a fairly weak one. *See Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir.1997) (finding that protected activity followed by discharge creates an inference of causation).

#### b. GAMC's reason for not sending the documents to the Medical Board.

Because Pieszak has shown a prima facie case of retaliation, the burden shifts to GAMC "to present legitimate reasons for the adverse employment action." *See Brooks*, 214 F.3d 1082, 1091.

GAMC has come forward with an explanation. GAMC was concerned that Pieszak would sue it again if it released documents about Pieszak to the Medical Board. (GAMC's Reply at 23.)

#### c. Pieszak's Burden to Establish Pretext.

■ Because GAMC has come forth with a nondiscriminatory explanation for its actions, the burden shifts back to Pieszak to raise a genuine factual issue as to whether the articulated explanation was pretextual. *See Brooks*, 214 F.3d 1082, 1091. Because Pieszak failed to present evidence to create such a genuine issue of fact in her initial opposition, the Court granted her leave to file supplemental evidence in opposition. Even with this sup-

---

**21.** Moreover, even assuming that Pieszak could show that the contact was made on behalf of GAMC, the Court doubts that such a

contact could be viewed as either defamatory or retaliatory.

plemental evidence, a reasonable jury could not find that GAMC's proffered reason is pretextual. Indeed, the evidence further shows that GAMC reasonably feared further litigation if it provided the documentation to the Medical Board.

Pieszak argued, at the hearing and in her supplemental filing, that

> GAMC's proposed release, unique to Dr. Pieszak (1) gave permission to GAMC to provide whatever false information to the Medical Board that it wanted ... (2) was a "settlement" containing broad ... language that arguably released GAMC from liability from this lawsuit; and (3) required Plaintiff to admit (contrary to the facts) that GAMC's termination of her was a "suspension," enabling GAMC to argue that Riffel did not violate administrative procedure by terminating Plaintiff.

(Pl.'s Supp. Brief Letter at 2.) Pieszak's contention are either not supported by the evidence or fail to show that GAMC's concern was merely pretextual.

The release itself is limited and unobjectionable. It purported to release GAMC from liability from any claim "arising out of or resulting from" its disclosure of the *requested* information to the Medical Board.[22] (Pl.'s Supp. Ex. 2.) Thus, the release could not, even arguably, be treated as a waiver of Pieszak's underlying claim against GAMC.

Moreover, in their letters responding to GAMC's request, Pieszak and her counsel do not express any belief that the release would require Pieszak to waive her claim resulting from her termination. Indeed, Pieszak's reason for not signing the release, at that time, was that she refused to waive her right to require GAMC to provide accurate information to the Medical Board. Clearly, Pieszak's reason, which was expressed to GAMC, merely reinforced GAMC's perceived threat of litigation.[23]

Finally, Pieszak's complaint about the "suspension" language is irrelevant to determining whether GAMC's proffered reason is pretextual. As GAMC points out, Pieszak never made any effort to correct this error or to address in any other way GAMC's reasonable litigation concerns.

Of course, GAMC was eventually forced to turn over the documents without Pieszak's release. As the Court previously found, the Medical Board's delay in issuing a subpoena for the documents violated Pieszak's rights. However, the Medical Board's shortcomings are not GAMC's fault.

In short, the evidence supports GAMC's proffered explanation and completely dispels Pieszak's weak presumptive showing of retaliation. Accordingly, the Court GRANTS summary judgment on Pieszak's Title VII retaliation claim in favor of GAMC.

## B. FEHA and Wrongful Termination Claims.

FEHA "prohibits employers from discriminating against certain protected classes in compensation, terms, conditions or privileges of employment." *Kelly v. Methodist Hospital of Southern California*, 22 Cal.4th 1108, 1114, 95 Cal.Rptr.2d 514, 997 P.2d 1169 (2000). Under the FEHA provisions in effect at the time of the conduct at issue in this case and at the time that the complaint was filed, FEHA defined an employer to exclude "a religious

---

**22.** The Court notes that in describing the information to be disclosed, the release tracks the language of the Medical Board's request.

**23.** Indeed, although Pieszak claims that GAMC was sufficiently protected by the qualified privilege of California Civil Code §§ 47(c) and 43.8, her responses to GAMC do not indicate that she believed that she could not sue GAMC for its disclosure to the Medical Board. Although the standard might be high (malice), that standard could arguably be met by the disclosure of knowingly false information. Pieszak's letters contended that GAMC's documentation contained false information that GAMC and its representatives knew to be false.

association or corporation not organized for private profit." *Id.* Most of the parties' arguments concerning this issue have been resolved by *Kelly*. *Kelly* makes clear that FEHA means what it says: a nonprofit religious organization is (or better stated was) exempt from all FEHA provisions. *Id.* at 1119, 1124–25, 95 Cal.Rptr.2d 514, 997 P.2d 1169.

■ GAMC presents evidence that it is organized as a nonprofit religious corporation under California law. Pieszak can present no evidence contradicting this evidence. Accordingly, GAMC is not required to comply with FEHA. Similarly, Pieszak's wrongful termination claim based on gender discrimination is precluded. *See Kelly*, 22 Cal.4th at 1112, 95 Cal. Rptr.2d 514, 997 P.2d 1169 (noting that case was brought as wrongful termination claim, not FEHA claim); *Jennings v. Marralle*, 8 Cal.4th 121, 135–36, 32 Cal. Rptr.2d 275, 876 P.2d 1074 (1994).

■ The Court briefly considers one argument raised by Pieszak.[24] Pieszak argues that FEHA's religious exemption violates the Federal and State Constitutions' Establishment Clauses.[25] Although the question was raised on appeal in *Kelly*, the California Supreme Court refused to address it. *Kelly*, 22 Cal.4th at 1111 n. 3, 95 Cal.Rptr.2d 514, 997 P.2d 1169. Moreover, no published opinion has considered the constitutionality of FEHA's religious exception. The Court concludes that the FEHA exemption is not unconstitutional.

**24.** Plaintiff's arguments that GAMC waived its FEHA exemption and that Title VII preempts FEHA border on the frivolous.

**25.** Plaintiff also argues that the FEHA religious exemption violates California's "No Preference" Clause. This argument is without merit. The "No Preference" Clause prohibits giving a preference in favor of *"one religion as opposed to another"* religion. *Mandel v. Hodges*, 54 Cal.App.3d 596, 617, 127 Cal.Rptr. 244 (1976) (italics added); *accord Hewitt v. Joyner*, 940 F.2d 1561, 1566 (1991) ("The no preference clause has been found to prohibit any appearance that the

"This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). In *Amos*, the Court, applying the *Lemon* test, determined that Title VII's religious exemption did not violate the Establishment Clause. *Id.* at 334–35, 107 S.Ct. 2862. The *Lemon* test continues to be the appropriate test for determining whether a state action violates the Establishment Clause. *See Children's Healthcare Is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084, 1092–93 (8th Cir. 2000); *Boyajian v. Gatzunis*, 212 F.3d 1, 4 (1st Cir.2000).

The *Lemon* test concludes "that a law does not violate the Establishment Clause if (1) it has a secular legislative purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) the statute does not foster excessive government entanglement with religion." *Boyajian*, 212 F.3d at 4.

In *Amos*, the plaintiff asserted that the Title VII exemption did not satisfy the first *Lemon* factor because it was unnecessarily broad.[26] The Court rejected that argument:

> Under the *Lemon* analysis, it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations

government has allied itself with one specific religion"). The FEHA religious exemption applies to all religious non-profit organizations. *See Kelly*, 22 Cal.4th at 1114, 95 Cal. Rptr.2d 514, 997 P.2d 1169. Thus, the FEHA religious exemption *does not* provide a preference to one religion over any other religion.

**26.** The Court notes that Plaintiff does not even mention the *Lemon* test in her opposition, let alone address the factors. It appears that her focus is on the second factor of the *Lemon* test. The Court, nevertheless, addresses all three factors.

to define and carry out their religious missions. Appellees argue that there is no such purpose here because [the exemption] provided adequate protection for religious employers prior to the 1972 amendment, when it exempted only the religious activities of such employers from the statutory ban on religious discrimination. We may assume for the sake of argument that the pre–1972 exemption was adequate . . . . Nonetheless, it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. The line is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission. Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission.

*Amos,* 483 U.S. at 335–36, 107 S.Ct. 2862 (footnote omitted). The same rationale applicable to the Title VII exemption applies to the FEHA exemption, even though the FEHA exemption is broader. Indeed, *Kelly* pointed out that just because a religious organization is involved in providing health care does not mean that it is engaged in non-religious activity. *Kelly,* 22 Cal.4th at 1124–25, 95 Cal.Rptr.2d 514, 997 P.2d 1169. Thus, the FEHA exemption satisfies the first factor in the *Lemon* test.

Pieszak's main argument is that the exemption impermissibly endorses religion. "A law is not unconstitutional simply because it allows churches to advance religion, which is their very purpose." *Amos,* 483 U.S. at 337, 107 S.Ct. 2862. Nevertheless, "[a]t some point, accommodation may devolve into an unlawful fostering of religion." *Id.* at 334–35, 107 S.Ct. 2862 (quotations omitted). The point is crossed

when "it is fair to say that the government itself has advanced religion through its own activities and influence." *Id.* at 337, 107 S.Ct. 2862. The FEHA exemption does not reach that point.

Finally, "[i]t cannot be seriously contended that [Title VII religious exemption] impermissibly entangles church and state; the statute effectuates a more complete separation of the two and avoids . . . [any] intrusive inquiry into religious belief." *Amos,* 483 U.S. at 339, 107 S.Ct. 2862. As with Title VII, the FEHA exemption clearly creates a strong separation between church and state. Accordingly, the Court finds that the FEHA exemption passes federal constitutional muster.

Moreover, California's Establishment Clause applies the same analysis as its federal counterpart. *Duffy v. State Personnel Board,* 232 Cal.App.3d 1, 9, 283 Cal.Rptr. 622 (1991); *Mandel v. Hodges,* 54 Cal.App.3d 596, 616–17, 127 Cal.Rptr. 244 (1976). Accordingly, FEHA religious exemption also does not offend California's Constitution.[27]

The Court GRANTS summary judgment for all Defendants on the FEHA and wrongful termination claims.[28]

## C. Contract Claims.

Pieszak asserts that GAMC breached the PDTA by terminating her without providing a hearing. GAMC asserts Pieszak cannot assert a breach of contract claim because (1) Pieszak was an at-will employee subject to termination at any time for any or no reason, and (2) in any event, she was not entitled to a hearing under § 2.07 of the PDTA.

The PDTA did contain an at-will provision. (*See* PDTA § 6.07.) Such a provision, however, does not mean that Pieszak

---

**27.** The Court also notes that Pieszak's FEHA retaliation and harassment claims would fail for the very same reasons that the Title VII claims failed. *See Brooks,* 214 F.3d 1082, 1087; *Tarin v. County of Los Angeles,* 123 F.3d 1259, 1264 n. 4 (9th Cir.1997).

**28.** The Court notes that this holding disposes of the only two claims against Lopez: harassment and retaliation under FEHA.

was not entitled to a hearing. The PDTA *expressly* states that termination under the at-will provision "shall have no effect upon Resident's right to a fair hearing if applicable upon termination hereof." (*Id.*) Thus, even if GAMC had decided to terminate Pieszak by flipping a coin, the contract written by GAMC required the hospital to provide her a fair hearing.

■ On the other hand, the PDTA does not require GAMC to provide a hearing if Pieszak was terminated for failing the USMLE. Because she failed the USMLE, Pieszak was unable to obtain a medical license by August 1996. That failure constituted "grounds for immediate termination ... without resort to those fair procedure rights [specified in the contract]." (PDTA § 2.07.) GAMC's argument, however, is unavailing for two reasons. First, although GAMC attempts to use the USMLE results to show that Pieszak lacked sufficient knowledge to be in the program, Pieszak was not expressly terminated for failing to pass the USMLE. Second, Pieszak provides substantial evidence that GAMC waived its rights under § 2.07 until the results of her second attempt at the USMLE were received. Indeed, in October 1996, Pieszak was warned that failing the December 1996 USMLE would place her job in jeopardy.

Thus, Pieszak was entitled to a fair hearing in connection with her termination. She presents evidence that she did not receive such a hearing. Therefore, she is entitled to present her contract claim to a trier of fact.

Pieszak also asserts a breach of the covenant of good faith claim. GAMC contends that the Court should dismiss this claim because it is a mere duplicate of the breach of contract claim. It does appear that the bad faith claim is identical to the contract claim. Moreover, Pieszak offers no challenge to GAMC's argument. Ac-

cordingly, the Court finds that Pieszak's bad faith claim is not an independent claim and it is merged into Pieszak's breach of contract claim.

## D. Fair Procedure Claim Against Riffel.

■ Riffel contends that Pieszak cannot state a fair procedure claim against him. Pieszak retorts that she can state a claim because Riffel acted in concert with GAMC. The Court first notes that the parties' papers and citations on this issue were of no help to the Court. Nevertheless, the Court finds that Riffel cannot be held liable for failing to provide Pieszak with a fair procedure hearing.

■ A medical resident is entitled to a fair procedure hearing before a hospital terminates him or her from the program. *Ezekial v. Winkley,* 20 Cal.3d 267, 275, 142 Cal.Rptr. 418, 572 P.2d 32 (1977). The underlying rationale for providing a fair procedure hearing is that "*certain private entities* possess substantial power either to thwart an individual's pursuit of a lawful trade or profession, or to control the terms and conditions under which it is practiced." *Id.* at 272, 142 Cal.Rptr. 418, 572 P.2d 32 (italics added). The fair procedure hearing has been applied to "labor unions[,] ... professional and trade organizations, ... mutual benefit societies, and other fraternal and social groups." *Id.* at 272–73, 142 Cal.Rptr. 418, 572 P.2d 32. However, the Court has found no case, and Pieszak points to no case, in which a court has allowed a lawsuit against an individual party for failing to provide fair procedure.[29]

Pieszak provides no reason, compelling or otherwise, to expand the claim to agents who fail to ensure that the hospital has complied with its common law obligations. Accordingly, the Court GRANTS summary

---

**29.** Plaintiff's reliance on *Westlake Comm. Hosp. v. Superior Court,* 17 Cal.3d 465, 131 Cal.Rptr. 90, 551 P.2d 410 (1976) is misplaced. Although the *Westlake* plaintiff did sue individuals who were members of the hospital's committee, *Westlake* did not contain a fair procedure hearing claim.

judgment for Riffel on Pieszak's fair procedure claim.

## E. Slander Claim Against Riffel.

### 1. Evidence presented by the parties.

Pieszak presents a declaration of Nelly Dominguez. The declaration states that between September 1996 and January 1997, Riffel told Dominguez "several times that Dr. Pieszak was sleeping with Dr. Frields." (Hensleigh Decl. Ex. 22 at ¶ 5.) Dominguez also claimed that, "[a]t least one time, Dr. Riffel said all the nurses ... knew about it because Dr. Pieszak and Dr. Frields were having sex in the residents' call room." (*Id.*) The declaration states it was "[e]xecuted this [blank space] day of January 1997 in [blank space] California." (*Id.* at 2.)

At her deposition on June 4, 1998, Dominguez' memory had apparently faded.[30] She testified that she had no recollection of Riffel telling her that Pieszak had slept with anyone. Nevertheless, Dominguez testified that (1) she signed the declaration in January 1997, (2) she "had knowledge about the contents of the declaration," and (3) at the time she signed the declaration, "the matters in the declaration were fresh in [her] memory." (Dominguez Depo. at 204–05.)[31]

### 2. Pieszak presents sufficient evidence.

Riffel does not dispute that making the statement he allegedly made would constitute slander. He, however, states that

there is no admissible evidence showing that he made any such statement. According to him, Dominguez' declaration is inadmissible because (1) it does not state the date on which it was executed; and (2) it is hearsay. Alternatively, Riffel asserts that the Court should disregard the declaration because it is contradicted by Dominguez' deposition.

Under 28 U.S.C. § 1746, a declaration must be dated to be admissible. Substantial compliance with the statute, however, is sufficient for admissibility. 28 U.S.C. § 1746; *accord Kersting v. United States,* 865 F.Supp. 669, 676 (D.Haw.1994); *E.E.O.C. v. World's Finest Chocolate, Inc.,* 701 F.Supp. 637, 639 (N.D.Ill.1988). For a declaration to be admissible, a party need only show "the [execution] date or approximate date (depending on the situation)." *World's Finest,* 701 F.Supp. at 639.

 Here, Dominguez' declaration and deposition testimony provide an approximate date of signature: January 1997. Riffel presents no reason why this approximate date is insufficient. Accordingly, the declaration is admissible for purposes of summary judgment. Moreover, the declaration's contents are separately admissible under the recorded recollection exception to the hearsay rule. *See* Fed. R.Evid. 803(5).[32]

Riffel's request that this Court disregard the declaration is unavailing. The "general rule in the Ninth Circuit is that a party cannot create an issue of fact by an

---

**30.** The Court also notes that Dominguez testified that she had taken Prozac at 8:00 a.m. the morning of the deposition. (Dominguez Depo. at 4–5.) She also testified that the medication affected her memory. (*Id.* at 5.) The deposition started at 10:20 a.m. and ended at 7:23 p.m. The Court further notes that it appears that no one asked Dominguez whether she took any more medication during that day.

**31.** The Court notes that Riffel presents evidence, in the form of his own declaration, that he never said that Pieszak was sleeping with Dr. Frields.

**32.** The recorded recollection exceptions states:

> The following are not excluded by the hearsay rule[:] ... A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection ..., shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect the knowledge correctly.

Fed.R.Evid. 803(5).

affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir.1991). Additionally, this general rule applies only if the declaration "flatly contradicts earlier testimony in an attempt to 'create' an issue of fact." *Kennedy,* 952 F.2d at 267.

The declaration does not contradict *prior* deposition testimony and does not flatly contradict the later deposition testimony upon which Riffel relies. Pieszak's evidence may be weak, but it is sufficient to withstand summary judgment.

### V. Conclusion

For the reasons articulated herein, the Court GRANTS summary judgment:

1) in favor of Defendant Lopez on all claims asserted against him;

2) in favor of Defendant Riffel on the FEHA claims (Counts 7 & 8) and on the Denial of Fair Procedure claim (Count 11); and

3) in favor of GAMC on the Title VII claims for sexual harassment and retaliation (Counts 2 & 3), the FEHA claims (Counts 6, 7, & 8), the wrongful termination claim (Count 12); and all claims asserted in the Supplemental Complaint.

The Court DENIES the summary judgment motions on the following claims: Title VII gender discrimination claim against GAMC (Count 1), the breach of contract claims against GAMC (Counts 4 & 5), and the slander claim against Riffel (Count 9).

The Court notes that the following claims were not challenged: the negligent supervision claim against GAMC (Count 10) and the denial of fair procedure claim against GAMC (Count 11).

**SO ORDERED.**